Filed 11/16/21  P. v. Lopez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. LUIS LOPEZ, Defendant and Appellant. | B303552 (Los Angeles County Super. Ct. No. NA112378) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard R. Romero, Judge.  Affirmed.

Maura F. Thorpe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob A. Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey,

Senior Assistant Attorney General, Idan Ivri and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

In April 2018, in the course of unsuccessfully attempting to evade arrest outside his home, appellant Luis Lopez dropped a bag containing contraband. This was witnessed by Jose R., who frequented a nearby restaurant owned by his family. Jose pointed police to the bag, and was listed as a witness in the police report concerning Lopez's arrest, which led to an underlying case against Lopez. In November 2018, Lopez approached Jose -- with whom he had never spoken -- outside Jose's family's restaurant, and allegedly asked him to say hello to his (Jose's) sons. In February 2019, pursuant to a subpoena, Jose reported to a courthouse for the preliminary hearing in the underlying case. Lopez saw Jose enter the courthouse around the same time he entered for his hearing, and during the lunch recess, saw Jose immediately outside the courthouse. Unprompted, Lopez told Jose he (Lopez) was a good person and his neighbors did not like him.

Based on Lopez's encounters with Jose at the restaurant and courthouse, the People charged Lopez with two counts of attempting to dissuade a witness from giving testimony. The more serious count (count two), based on the restaurant encounter, alleged that the attempt was made through an implied threat of force or violence. The People

2

also alleged that Lopez committed both offenses for the benefit of Rancho San Pedro (RSP), the criminal street gang to which he admittedly belonged.  Before trial, the court denied Lopez's motion under Penal Code section 995 to dismiss the gang allegation.  The court further denied Lopez's motion to bifurcate trial on the allegation, finding that gang evidence would be admissible at trial on the charged offenses even in the absence of the gang allegation.  At trial, while Lopez disputed mentioning the names of Jose's sons during the restaurant encounter, the facts of the courthouse encounter were largely undisputed.  Various evidence related to Lopez's RSP membership and RSP's activities was admitted.  Also admitted was a recording of a 2010 phone call in which Lopez appeared to agree to a fellow RSP member's request to "fire on" a third RSP member who had served as an informant, although no evidence was presented that Lopez ever acted on this request.

The court delivered limiting instructions concerning the gang evidence and the 2010 call.  The jury convicted Lopez on count one (the courthouse encounter), but found the gang allegation untrue.  The jury failed to return a verdict on count two, which was later dismissed by the court.

On appeal, Lopez contends there was insufficient evidence to sustain his conviction on count one for attempting to dissuade a witness within the meaning of Penal Code section 136.1, subdivision (a)(2).  He further contends the trial court prejudicially erred by (1) denying his pretrial motion under Penal Code section 995 to dismiss the

3

gang allegation, which he asserts resulted in the admission of prejudicial gang evidence; (2) admitting the 2010 call concerning an informant, which he argues should have been excluded as prohibited character evidence under Evidence Code section 1101, subdivision (a); and (3) admitting certain gang evidence, which he argues should have been excluded under Evidence Code section 352.

We conclude that substantial evidence supported Lopez's conviction for attempting to dissuade Jose from giving testimony at the preliminary hearing, as Lopez's undisputed statements to Jose at the courthouse could fairly be construed to fall within the description of Penal Code section 136.1, subdivision (a)(2). We further conclude that Lopez was not prejudiced by any of the trial court's asserted errors, as the jury's not-true finding on the gang allegation and the lack of conviction on the more serious witness-dissuasion count made clear the jury evaluated the evidence dispassionately, without being unduly influenced by evidence of Lopez's gang affiliation or prior conduct in connection with his gang membership. Accordingly, we affirm.

## PROCEEDINGS BELOW
### A. Pretrial

In count one, based on Lopez's interaction with Jose at the courthouse in February 2019, the People charged Lopez with attempting to dissuade a witness from giving testimony (Pen. Code, § 136.1, subd. (a)(2)). In count two, based on

4

Lopez's earlier interaction with Jose at the restaurant in November 2018, the People charged Lopez with attempting to dissuade a witness from giving testimony by force or threat (*id.*, § 136.1, subd. (c)(1)). The People alleged that Lopez committed both offenses for the benefit of a criminal street gang and with the specific intent to promote criminal conduct by gang members (*id.*, § 186.22, subd. (b)(1)(B)).

Based on evidence presented at the preliminary hearing, the magistrate held Lopez to answer on both counts and on the gang allegation. Contending the magistrate erred in finding sufficient evidence to establish probable cause, Lopez moved to set aside the information in its entirety under Penal Code section 995. The trial court denied the motion.

Lopez moved to bifurcate trial on the gang allegation from trial on the charged offenses, arguing that gang evidence (in general) was inflammatory and lacked probative value with respect to the charges. In opposition, the prosecutor argued that gang evidence was highly probative of Lopez's motive to commit the charged offenses and his intent to dissuade Jose from giving testimony. In rebuttal, defense counsel argued that had the gang allegation not been filed, no gang evidence would be relevant or admissible at trial on the charged offenses. The court responded, "I disagree. I believe it would be independently admissible even apart from the gang allegation . . . . So the motion [for] bifurcation is denied."

***B. Prosecution Case***

**1. The Restaurant Encounter**

In 2018, Jose R. regularly visited his family's restaurant in San Pedro, about one block from the apartment building where Lopez lived with his girlfriend, Melissa Delgado. Jose did not know Lopez or Delgado. On April 24, 2018, while walking across the street from Lopez's building, Jose saw a car occupied by Lopez and Delgado pull into the driveway, pursued by a police vehicle. While Lopez fled from and eventually began wrestling with a pursuing officer, Jose saw a bag fall near Lopez. After the officer subdued and arrested Lopez, Jose informed another officer about the bag. Jose then walked to his family's restaurant, where an officer found him and obtained his contact information for inclusion in the police report, which listed Jose as a witness. Soon after Lopez's arrest, charges were brought against Lopez and Delgado. The jury was not informed of the nature of these underlying charges.

In November 2018 (some months after Lopez's arrest), while exiting his family's restaurant, Jose was approached by Lopez, with whom he had never spoken. Lopez said, "'I know you. Jose [R.]"[1] Jose asked Lopez how he was, and Lopez said he was fine. As they parted ways, Lopez said, "'Say hello to Jonathan and Saul.'" Jonathan and Saul were two of Jose's children. Jonathan testified that he did not know Lopez.

---

[1]     Jose's surname was redacted from the reporter's transcript.

## 2. The Courthouse Encounter

In early 2019, Los Angeles Police Department (LAPD) Detective Christina Ledesma served Jose with a subpoena requiring him to appear at the preliminary hearing in the underlying case, scheduled for February 13, 2019. Jose reported to the courthouse on that date and waited there until the lunch recess, during which he exited the courthouse. When Jose returned to the courthouse, he was greeted outside by Lopez. He did not then recognize Lopez as the man from the restaurant encounter or the defendant in the preliminary hearing. After Jose returned Lopez's greeting, Lopez said that "he was a good person," and that "a neighbor . . . didn't like him." When asked on cross-examination what "exactly" Lopez said to him, Jose testified, "We said hello to each other. He talked about the court, and I told him good luck." Lopez said nothing specific about why Jose was present at court.

During his interaction with Lopez, Jose noticed Detective Ledesma, who was standing nearby with Officer Robert Castruita, gesturing for him to approach. At the officers' request, Jose told them what Lopez had said. The officers informed Jose that Lopez was the defendant in the underlying case. Upon hearing this, Jose realized that Lopez was also the man who had mentioned Jonathan and Saul outside his family's restaurant. This realization made him worry for his younger children. Jose described the restaurant encounter to the officers. The officers told Jose that Lopez was a gang member, and that Jose should be

careful. Until that point, Jose had not known Lopez was a gang member.

### 3. Gang Experts

In addition to confirming his and Detective Ledesma's conversation with Jose at the courthouse, Officer Castruita testified as a gang expert. He testified that during interactions with Lopez in 2009 and 2014, he had prepared field identification cards that documented Lopez's self-identification as a member of RSP, as well as a tattoo reading "RSP" on Lopez's chest.[2] The prosecutor showed photographs of Lopez's many other tattoos to Officer Castruita, who opined that several of them signified membership in RSP or one of its subgroups, the 3rd Street Clique. The photographs also showed the following tattoos: (1) a dollar sign on Lopez's forehead; (2) the phrase "'Fuck Crash'" (referring to an LAPD gang unit) under his right eye; (3) the word "certified" on his upper lip, above a tattoo

---

[2] Other police officers testified about additional field identification cards prepared during interactions with Lopez or Delgado (unrelated to suspected criminal activity, other than littering and traffic offenses), between 2009 and 2015. The cards indicated that Delgado had several tattoos, including one on her right hand reading "'Rancho L.S.'" Testifying as a defense witness, Delgado denied that she was an RSP member or had any tattoo consistent with RSP membership. Lopez initially denied that he had seen Delgado's "'Rancho L.S.'" tattoo, before acknowledging that he had seen it and that it reflected membership in RSP.

referencing the 3rd Street Clique; (4) the phrase "'Get rich or get life trying'" under his chin; (5) a brass knuckle on his left arm; and (6) the initials "'C.K.'" immediately above his right hand. Officer Castruita testified that a brass knuckle is a weapon used to cause serious injury. He opined that Lopez's "'C.K.'" tattoo meant "Crip Killer," communicating a willingness to kill members of a rival gang, the Dodge City Crips. Finally, he opined that Lopez's "certified" tattoo meant that Lopez had earned the approval of the gang by putting in work. Asked to explain what he meant by "putting in work," the officer responded, "[D]o[ing] stuff that benefits the gang. It could be being an enforcer, being someone that gets involved in altercations with rival gang members, even some of the members that are in bad standing in the gang, someone that's willing to go out and commit shootings." Defense counsel's objection to this testimony for lack of foundation was overruled. On cross-examination, Officer Castruita acknowledged he did not know of any crime Lopez had committed to earn his tattoos.

Officer Angelo De Los Reyes also testified as a gang expert. He testified that RSP's primary activities included witness intimidation, vandalism, narcotic sales, firearm possession, shooting within city limits, assault with a deadly weapon, carjacking, robbery, and murder. When asked on cross-examination to explain what he meant by "primary" activities, he indicated that he used the term to refer to any activity RSP had engaged in within its territory, regardless of frequency or importance to the gang. He acknowledged

9

that in the preceding three years, he had worked on only one murder investigation involving RSP.

Officer De Los Reyes authenticated a record of a 2017 conviction for unlawful possession of a firearm sustained by RSP member Jose Louis Rios. He testified that Rios had a tattoo of the number "187" on his head, and opined that this tattoo was a reference to Penal Code section 187, meaning homicide. He did not identify any homicide allegedly committed by Rios or any other RSP member.

In response to hypothetical questions modeled after Lopez's encounters with Jose at the restaurant and courthouse, Officer De Los Reyes opined that Lopez's statements to Jose were "nonaggressive" attempts to intimidate a witness for the benefit of RSP. He explained, in relevant part, "[T]his member is an asset to his organization, the older gang member. He's probably the enforcer of the gang. One of the enforcers of the gang . . . . [¶] . . . [¶] . . . [K]nowing that, he knows he needs to stay out of prison just because of the value he has outside of prison to be able to conduct his business for himself and for the gang." The prosecutor pointed out that she had not asked the officer to assume that the gang member was an enforcer. She asked whether the officer's opinion would change if he excluded all assumptions of that nature, and he said it would not, assuming the gang member was nevertheless important to the gang. On cross-examination, Officer De Los Reyes acknowledged that he had heard no evidence at trial that Lopez was an enforcer, or that Lopez was important to RSP.

10

## 4. Phone Calls

During Officer Castruita's testimony, the prosecutor played a recording of a jail call made in 2010 by RSP member Moses Escalante (also known as Playboy), who was then charged with soliciting a confidential informant (a fellow RSP member) to commit murder.[3] Escalante's call was answered by fellow RSP member Robert Messersmith, who said he was at an auto dealership with Lopez. Escalante asked Messersmith if "that guy" (whom Officer Castruita opined was the informant) was "out there," and Messersmith responded that he was hiding. After discussion of other topics, Messersmith inquired about the outlook of Escalante's case, and Escalante responded "we gonna catch this guy in some lies." Escalante then asked, "Where's he at, you don't know?" Messersmith responded, "No but I'm gonna find out."

After he and Escalante briefly discussed another topic, Messersmith handed the phone to Lopez. Allegedly referring to the informant, Escalante told Lopez he wished he had known "his status" earlier, adding he had heard in jail that

---

[3]      Before trial, anticipating an objection that Lopez's participation in the 2010 call was prohibited character evidence, the prosecutor filed a motion for permission to introduce the evidence to prove motive and intent under Evidence Code section 1101, subdivision (b). The trial court granted the motion, explaining that the call was "strongly probative of Mr. Lopez's attitudes towards protection of the gang and fellow gang members," and that its probative value was not substantially outweighed by the risk of unfair prejudice.

11

"his whole family" shared his status. Lopez responded, "Yeah I already know." After a brief discussion of another topic, Escalante told Lopez, "If you see him fire on him if you can." Lopez responded, "Alright Play." They then ended the call. Officer Castruita opined that Escalante was expressing disappointment in the gang for failing to warn him about the informant, and telling Lopez to attempt to kill the informant if he had the chance. LAPD Sergeant Christian Urbina, who had investigated Escalante's solicitation-for-murder case, testified that although Lopez was arrested in the course of the investigation, any charges against Lopez were dismissed.

The prosecutor also played recordings of two calls between Messersmith and Lopez in April 2018. In the first, Messersmith said he might need Lopez because "Stoney's son just called me and he said . . . he thinks that some fools might wanna jump him," and Lopez agreed to join a three-way call. When asked to opine on the meaning of this conversation, Officer Castruita testified, "Mr. Messersmith is telling Mr. Lopez that he's gonna need him because there's someone that wants to jump Stoney's son. Stoney I know to be a Mexican Mafia member." He opined that the conversation was related to RSP's activities, but did not elaborate. In the second 2018 call, Messersmith told Lopez to ask "Monster" his whereabouts because they would be "jumping . . . in" two men, and Lopez informed Messersmith that Monster had not answered his phone. Officer Castruita opined that Monster was an RSP member

12

and that Messersmith was asking for Lopez's assistance in arranging new RSP members' initiation.

### C. Defense Case and Rebuttal

Lopez testified that before he ever spoke to Jose, he and Delgado often visited the restaurant owned by Jose's brother, who lived nearby with Jose's nephew Daniel. He and Delgado knew Daniel. Delgado corroborated this testimony.

Lopez further testified that he sometimes saw Jose in the area, but never spoke to him until November 2018, outside the restaurant. He claimed that he asked Jose about Daniel's whereabouts (hoping to smoke with him), and after Jose responded that Daniel was at home, he asked Jose to say hello to Daniel for him.[4] Lopez denied that he used Jose's name or mentioned Jonathan and Saul. He further denied that he intended to dissuade Jose from giving testimony, or even knew that Jose was a witness. He claimed he never asked his counsel in the underlying case who the witnesses were, and never read a copy of the police report.

On the day of his preliminary hearing, Lopez first saw Jose as they both waited in line to pass through security and enter the courthouse. During the lunch recess, he exited the courthouse and again saw Jose "[r]ight outside the doors." Again, Lopez denied that he intended to dissuade Jose from

---

[4]    Jose had testified that Lopez did not mention Daniel.

giving testimony, or even knew that Jose was a witness, claiming he decided to approach Jose because he "kn[e]w him from around the neighborhood." He greeted Jose, who walked over to him. He told Jose "[t]hat it's embarrassing, and that I'm not a bad person and some neighbors just don't like me." When asked on direct and cross-examination to explain why he told Jose these things, he mentioned that Jose had seen him at court, and that his neighbors (potentially including Jose) were aware that (1) in April 2018, he had been arrested outside his home; (2) a week later, police had "raided" his home; and (3) in December 2018, he had been shot in the neighborhood. He testified, "I don't want him to think I'm a bad person." He further testified that after he spoke to Jose, Jose merely responded "'Okay'" and mentioned that someone wanted to take him out to lunch, before Detective Ledesma and Officer Castruita interrupted.

Lopez acknowledged, on direct examination, that he had sustained a 2007 conviction for felony assault and battery, and a 2014 conviction for second degree burglary. On cross-examination, he further acknowledged that he had lied to his parole officer about his home address, and had repeated this lie to a police officer on the day of his arrest.[5]

---

[5] The jury was instructed that it could consider a witness's commission of a crime or other misconduct in evaluating the witness's credibility.

A defense gang expert testified that Lopez's tattoos did not show he had committed any crime. He further testified that RSP's primary activities are social, and that its primary *criminal* activities are vandalism and drug sales. He opined that if Lopez committed the charged witness-dissuasion offenses, he did so for his own benefit, not for the benefit of RSP. He suggested that had Lopez intended to dissuade Jose from giving testimony, Lopez likely would have attempted to do so earlier, more often, through fellow gang members, and in an unambiguously threatening manner.

Called as a rebuttal witness, Office Castruita testified that it was consistent with RSP's witness intimidation tactics to use subtle means of dissuasion. The prosecutor, noting that RSP sounded like a "scary" gang because its primary activities allegedly included murder, asked why a member of the gang would forego threats of violence in favor of a subtler method of intimidation. Officer Castruita responded that RSP members knew they were more likely to be prosecuted if they made direct threats.

### D. Jury Instructions and Closing Arguments

The court instructed the jury that if the prosecution proved by a preponderance of the evidence that Lopez committed the uncharged conduct of "agree[ing] to participate in the intimidation of a witness" (as alleged with respect to the 2010 call with Escalante), the jury could, but was not required to, consider that evidence for the purpose of deciding whether Lopez acted with the specific intent

15

required to prove the charged offenses.  The court further instructed the jury, "In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and the charged offenses.  [¶] Do not consider this evidence for any other purpose.  [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."  With respect to the gang evidence, the court instructed the jury, "You may consider evidence of gang activity only for the limited purpose of deciding whether:  [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged.  [¶] OR [¶] The defendant had a motive to commit the crimes charged.  [¶] You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

The prosecutor repeatedly reminded the jurors that their duty was not to judge Lopez's character, and argued their principal duty was instead to decide whether Lopez or Jose had told the truth about their encounters.  With respect to the restaurant encounter (count two), the prosecutor argued that Lopez's reference to Jose's sons, especially when understood in the context of Lopez's gang membership, constituted an implied threat to harm Jose or his family if he gave testimony.  With respect to the courthouse encounter (count one), the prosecutor argued that Lopez intended to convince Jose not to testify, thereby interfering with the

16

orderly administration of justice, by convincing Jose he was a good person. She argued Lopez had no plausible reason to speak to Jose at the courthouse other than an intent to dissuade him from giving testimony. She further argued that the 2010 call was circumstantial evidence of such intent because it showed that RSP members had a longstanding practice of seeking out witnesses against them, undermining the credibility of Lopez's claim that he did not know Jose was a witness because he had never asked who the witnesses were. The prosecutor reminded the jury that the 2010 call was "not in there to say the defendant is a bad person."

The prosecutor further argued that Lopez committed both charged offenses for the benefit of RSP. Although the prosecutor mentioned evidence that RSP's primary activities included violent crimes such as murder and assault (along with nonviolent crimes), she did not refer to any specific instance of violent crime. She relied only on nonviolent convictions -- the charged witness-dissuasion offenses, and RSP member Rios's conviction for being a felon in possession of a firearm -- in arguing that RSP had engaged in a pattern of criminal activity, as required to prove the gang allegation. The prosecutor did not mention Rios's "187" tattoo, or argue that Lopez's tattoos reflected criminal activity. Nor did she mention the Mexican Mafia, or any testimony that Lopez was an "enforcer" for RSP.

Lopez's counsel argued the prosecution had failed to prove beyond a reasonable doubt that Lopez intended to dissuade Jose from giving testimony, or even that Lopez

17

knew Jose was a witness.  He observed there was no dispute that at the courthouse, Lopez told Jose he was a good person and his neighbors did not like him.  Counsel argued that these statements were motivated by Lopez's embarrassment about what Jose or his family might think of him, and that they could not reasonably be interpreted as an attempt to dissuade Jose from giving testimony.  He argued there was no similarity between Lopez's statements to Jose and his alleged agreement in 2010 to attempt to kill an informant against Escalante, and reminded the jury of the instruction to consider their similarity or lack thereof.  Finally, counsel argued that if the jury found Lopez attempted to dissuade Jose from giving testimony against him, it should not find he did so in order to benefit RSP, as Lopez naturally would have been motivated by his own benefit in remaining out of prison.

### E. Verdict and Sentencing

The jury convicted Lopez of attempting to dissuade a witness as charged in count one (the courthouse encounter), but found the gang allegation untrue.  The jury failed to return a verdict on count two, reporting that it was deadlocked.  The court declared a mistrial on count two, and dismissed the count after the prosecution represented it would not proceed.

The court sentenced Lopez to three years imprisonment.  Lopez timely appealed.

## DISCUSSION

### A. Sufficiency of the Evidence

Lopez contends there was insufficient evidence to sustain his witness-dissuasion conviction under Penal Code section 136.1, subdivision (a)(2). "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Morales* (2020) 10 Cal.5th 76, 88.) A court applying this standard "'"presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" (*Ibid.*)

Penal Code section 136.1, subdivision (a)(2) prohibits "[k]nowingly and maliciously attempt[ing] to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." "'Malice'" is defined to mean "an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." (*Id.*, § 136, subd. (1).) Under this definition, the malice requirement has little independent significance, as "preventing [or dissuading] a witness from testifying always interferes in some manner 'with the orderly administration of justice . . . .'" (*People v. Wahidi* (2013) 222 Cal.App.4th

19

802, 807 (*Wahidi*).) "The crime of attempting to dissuade a witness from testifying is a specific intent crime. [Citation.] 'Unless the defendant's acts or statements are intended to affect or influence a potential witness's or victim's testimony or acts, no crime has been committed under this section.' [Citation.] The circumstances in which the defendant's statement is made, not just the statement itself must be considered to determine whether the statement constitutes an attempt to dissuade a witness from testifying. [Citation.] If the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, [a jury is entitled to find] the offense has been committed." (*Id.* at 806.)

Here, the jury reasonably could find that in speaking to Jose during the preliminary hearing's lunch recess, Lopez knowingly and maliciously attempted to dissuade Jose from giving testimony at the hearing. Even assuming Lopez had not previously known that Jose was a witness, the jury reasonably could find that Lopez realized Jose was a witness when he saw Jose (whom he recognized from his neighborhood, where he was arrested in the underlying case) entering the courthouse at the same time he was entering for his preliminary hearing, or when he saw Jose immediately outside the courthouse during the lunch recess. The jury was not compelled to find that Lopez encountered

Jose by accident.[6] Further, it was undisputed that Lopez brought himself to Jose's attention at the courthouse and initiated a conversation in defense of his character, even though he and Jose had spoken only once before, in passing. Given that Lopez's unprompted defense of his character was made on the courthouse steps, to a person he might reasonably have believed to be a witness in the criminal proceeding against him, the jury reasonably could infer that Lopez intended to dissuade Jose from giving testimony unfavorable to him, by persuading Jose that he (Lopez) did not deserve the potential consequences of unfavorable testimony. This inference, in turn, supported a finding of malice. (See *Wahidi*, *supra*, 222 Cal.App.4th at 807 [defendant's intentional attempt to convince witness not to testify at preliminary hearing satisfied malice requirement].) We conclude that substantial evidence supported the jury's finding that Lopez knowingly and maliciously attempted to dissuade Jose from giving testimony. Because this evidence is substantial without consideration of any gang evidence, we need not address Lopez's arguments that certain gang evidence was insufficient to support his conviction.

Lopez fails to cite any case reversing a witness-dissuasion conviction for insufficient evidence. Instead, he

---

[6] As it was instructed, the jury was entitled to evaluate Lopez's credibility in light of his two prior felony convictions and other misconduct, such as his lies to parole and police officers about his home address.

21

contrasts the evidence here with the evidence found sufficient in other cases. (See *Wahidi*, *supra*, 222 Cal.App.4th at 804-806 [defendant approached witness one day before preliminary hearing and asked to "settle" case through informal Muslim dispute-resolution custom]; *People v. Young* (2005) 34 Cal.4th 1149, 1210 [defendant punched witness in express retaliation for past cooperation with police, implying threat to harm witness if he testified in future]; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1337, 1343-1345 [two days after witness testified against defendant's brother at preliminary hearing, defendant told witness she had "'fucked up his brother's testimony'" and he would "'talk to'" fellow gang members, implying threat of force or violence]; *People v. Ford* (1983) 145 Cal.App.3d 985, 987, 989 [at conclusion of preliminary hearing, defendant threatened to "'get'" witness and mentioned that witness had kids]; cf. *People v. Lyons* (1991) 235 Cal.App.3d 1456, 1458-1459 & fn. 3 [defendant was not prejudiced by erroneous instruction that witness dissuasion was general-intent crime, where specific intent to dissuade was only plausible explanation for defendant's sending letter to witness implicitly demanding that witness withhold or falsify testimony].) The holdings of those cases do not suggest that the evidence here was insufficient. (See *People v. Casares* (2016) 62 Cal.4th 808, 828 ["'When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts'"], disapproved on another ground by *People v.*

*Dalton* (2019) 7 Cal.5th 166; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1075 ["defendant asserts his actions were not of the same character as those found to constitute lying in wait in other cases . . . . No matter. Because each case necessarily depends on its own facts, and because defendant's conduct clearly satisfied each of the lying-in-wait requirements, the attempt to contrast this case with others falls short"].) As we have explained, the undisputed facts of the courthouse encounter were sufficient to support the jury's finding that Lopez knowingly and maliciously attempted to dissuade Jose from giving testimony at the preliminary hearing.

### B. Motion to Dismiss Gang Allegation

The jury found untrue an allegation that Lopez committed the offense of conviction for the benefit of a gang. Nevertheless, Lopez contends the trial court prejudicially erred by denying his pretrial motion under Penal Code section 995 (Section 995) to dismiss the gang allegation, asserting that the allegation resulted in the admission of prejudicial gang evidence.

Section 995 requires a trial court to dismiss an allegation from an information if the magistrate erred in finding probable cause. (See Pen. Code, § 995, subd. (a)(2)(b).) A trial court's denial of a Section 995 motion is reviewed for error under an "'exceedingly low'" standard, under which the reviewing court asks only "'whether the evidence is such that "a reasonable person could harbor a

23

strong suspicion of the defendant's guilt.""'" (*People v. Superior Court (Sahlolbei)* (2017) 3 Cal.5th 230, 245.) "[E]ven an erroneous denial of a section 995 motion justifies reversal of a judgment of conviction only when a defendant is able to demonstrate prejudice at trial flowing from the purportedly inadequate evidentiary showing at the preliminary hearing." (*People v. Crittenden* (1994) 9 Cal.4th 83, 136-137.)

We need not decide whether the court erred in denying Lopez's motion under Section 995 to dismiss the gang allegation, as we conclude any error was harmless. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 138 ["We do not reach the merits of the question whether the trial court erred by denying the section 995 motions, because defendants cannot establish that any error in this regard was prejudicial"].) The record does not support Lopez's assertion of a causal connection between the denial of his motion and the admission of prejudicial gang evidence. After the trial court declined to dismiss the gang allegation, Lopez moved to bifurcate trial on the allegation from trial on the charged offenses, and argued gang evidence would be irrelevant and inadmissible in the latter. The court disagreed and denied the bifurcation motion (a ruling Lopez does not challenge), concluding that gang evidence "would be independently admissible even apart from the gang allegation . . . ." Thus, the record indicates that even had the court granted Lopez's motion under Section 995, the court would have admitted some or all of the challenged gang

evidence. Regardless of whether the court erred in admitting the evidence -- an issue we address below -- any error did not flow from the denial of the Section 995 motion. (Cf. *People v. Ramirez* (2016) 244 Cal.App.4th 800, 820-823 [defendant was prejudiced by erroneous denial of motion under Section 995 to dismiss gang allegations and gang-participation charges, where prejudicial gang evidence was admitted "[a]s a direct result" of denial].) Because any error in the denial of the motion was harmless, it does not require reversal. (See *People v. Crittenden*, *supra*, 9 Cal.4th at 136-137.)

### C. *Evidence of 2010 Phone Call*

Lopez contends the trial court prejudicially erred in admitting, as evidence of his uncharged act of "agree[ing] to participate in the intimidation of a witness," the recording of the 2010 call in which he allegedly agreed to a fellow gang member's request to "fire on" an informant. Generally, "evidence of a person's character or a trait of his or her character," including such evidence in the form of "evidence of specific instances of his or her conduct," is inadmissible "when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) This rule does not prohibit the admission of "evidence that a person committed a[n] . . . act when relevant to prove some fact (such as . . . intent . . . ) other than his or her disposition to commit such an act." (*Id.*, § 1101, subd. (b).) Evidence of uncharged acts is admissible to prove intent if there is "'sufficient

25

evidence for the jury to find defendant committed both sets of [uncharged and charged] acts, and sufficient similarities to demonstrate that in each instance the perpetrator acted with the same intent or motive.'" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.* [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [*People v.*] *Watson* [(1956) 46 Cal.2d 818] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).)

Here, we need not decide whether the court erred in admitting the 2010 call, as we conclude any error was harmless. The jury was instructed that it could consider evidence of Lopez's uncharged acts only in deciding whether Lopez had the intent required to prove the charged offenses, viz., intent to dissuade Jose from attending or giving testimony at an authorized proceeding. In arguing that Lopez acted with such intent, the prosecutor neither emphasized the 2010 call nor argued that it evidenced Lopez's disposition to "fire on" or otherwise harm witnesses. Instead, the prosecutor merely argued the call evidenced a practice within Lopez's gang to seek out the identities of witnesses, undermining the credibility of Lopez's claim that he did not know Jose was a witness. There is no indication

26

in the record that the jury relied on the 2010 call to find Lopez knew Jose was a witness; the jury returned a conviction only with respect to the courthouse encounter, during which -- as we have discussed -- Lopez had reason to know Jose was a witness, even assuming he had not previously sought out that information.  Nor is there any indication in the record that the jury relied on the 2010 call for other purposes.  Defense counsel persuasively argued that the charged and uncharged acts lacked any material similarity and reminded the jury of the instruction requiring it to consider their similarity or lack thereof.  The prosecutor, in turn, reminded the jury that the 2010 call was not admitted "to say the defendant is a bad person."  Finally, the court instructed the jury not to conclude from the challenged evidence that Lopez had a bad character or was disposed to commit crime.  We presume the jury followed the court's instructions.  (See *People v. Williams* (2009) 170 Cal.App.4th 587, 607.)  Nothing in the record rebuts that presumption, especially given the jury's not-true finding on the gang allegation and its failure to return a conviction on the more serious of the two witness-dissuasion charges.  For these reasons, we conclude that Lopez has failed to show a reasonable probability that he would have obtained a more favorable result had the 2010 call been excluded, and reject his contention that the call's admission violated his due process rights.  In sum, any error in the call's admission was harmless.  (See *Partida, supra,* 37 Cal.4th at 439.)

27

### C. Gang Evidence

Lopez contends the trial court prejudicially erred in failing to exclude certain gang evidence under Evidence Code section 352, arguing the evidence's probative value was substantially outweighed by the risk of unfair prejudice. "The evidence barred by Evidence Code section 352 is evidence that uniquely causes the jury to form an emotion-based bias against a party and that has very little bearing on the issues of the case." (*People v. Thornton* (2007) 41 Cal.4th 391, 427.) "[B]ecause gang evidence may have a highly inflammatory impact on the jury, trial courts should carefully scrutinize such evidence before admitting it." (*People v. Montes* (2014) 58 Cal.4th 809, 859.) But "'nothing bars evidence of gang affiliation that is directly relevant to a material issue.'" (*Ibid.*) "'The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.'" (*Ibid.*)

Here, we conclude the trial court acted within its discretion in admitting certain evidence challenged by Lopez, viz., photographs of Lopez's tattoos of a brass knuckle and the initials "'C.K.,'" along with Officer Castruita's testimony that a brass knuckle is a weapon used to cause serious injury, and that "'C.K.'" communicated willingness to kill members of the Dodge City Crips. Because these tattoos were located on Lopez's left arm (the brass knuckle) and immediately above his right hand ("'C.K.'"), the jury reasonably could find that unless Lopez covered them with

long sleeves, they were visible to conversation partners and passersby.  The jury reasonably could further find that Lopez intended these tattoos to visibly associate himself with criminal activity, in reliance on Officer Castruita's testimony, in conjunction with unchallenged evidence that Lopez had a tattoo reading "Get rich or get life trying" under his chin.  These findings were relevant to the charged offenses under two theories.  First, Lopez might have expected Jose to perceive his visible association with criminal activity, and therefore to interpret his words as more threatening than they seemed on their face, supporting the prosecution theory that Lopez's reference to Jose's sons was an implied threat.  (Cf. *People v. Iboa* (2012) 207 Cal.App.4th 111, 119-120 [substantial evidence supported defendant's convictions for deterring executive officers from performing duties by threat of unlawful violence, despite defendant's failure to unambiguously threaten bodily harm, where his statements were made in context of aggressive conduct, including "showing off his gang tattoos"]; *People v. Islas* (2012) 210 Cal.App.4th 116, 126-127 [similar, with respect to defendants' convictions for false imprisonment by threat of harm].)  Second, the tattoos suggested Lopez took pride in advertising his association with criminal activity, undermining the credibility of his claim that being seen by Jose as a criminal defendant caused him such embarrassment that he felt motivated to defend his character.  This evidence had probative value and posed only a limited risk of unfair prejudice, as Officer Castruita did not

29

suggest Lopez had actually used a brass knuckle or attacked a rival gang member. Indeed, the officer acknowledged he did not know of any crime reflected in Lopez's tattoos. We conclude the trial court did not exceed the bounds of reason in admitting this evidence.

We need not decide whether the court erred in admitting the remaining gang evidence challenged by Lopez. We agree with the People that Lopez forfeited one of his challenges, and that in any event, Lopez has not shown prejudice. We address each piece of challenged evidence in turn.

First, we agree with the People that Lopez forfeited his objection under Evidence Code section 352 to Officer De Los Reyes's testimony, in response to a hypothetical question modeled after Lopez's charged conduct, suggesting that Lopez was likely an enforcer for his gang. Lopez did not object to this testimony in the trial court. (See *People v. Redd* (2010) 48 Cal.4th 691, 729 ["'trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal'"].) Nor did Lopez object on this ground to Officer Castruita's testimony similarly suggesting that Lopez might have earned his "certified" tattoo by serving as an enforcer. In any event, Lopez could not have been prejudiced by either officer's suggestion that he might have been an enforcer. The prosecutor made no such suggestion. On the contrary, she reminded Officer De Los Reyes that she had *not* asked him to assume Lopez's hypothetical stand-in was an

30

enforcer. On cross-examination, the officer acknowledged he had heard no evidence at trial suggesting Lopez was an enforcer, or even important to RSP. The record does not show a reasonable probability that in returning a conviction on count one, the jury relied upon the officers' brief references to Lopez's speculated status as an enforcer.

Nor does the record show such a probability with respect to Officer De Los Reyes's testimony that murder and other violent crimes were included in RSP's primary activities. The officer acknowledged that RSP's primary activities also included nonviolent (or potentially nonviolent) offenses, including vandalism, narcotics sales, firearm possession, and witness intimidation. He further acknowledged that he deemed the gang's activities "primary" without regard to their frequency or importance to the gang, and that he had worked on only one murder investigation involving RSP in the preceding three years. The defense gang expert contradicted the officer's opinion that RSP's primary activities included violent offenses, testifying that all its primary activities were nonviolent (social activities, vandalism, and narcotic sales). In closing argument, the prosecutor did not refer to any specific instance of violent crime. We conclude the record does not support Lopez's speculation that this evidence "confused the jury into thinking that because appellant is a dangerous and violent

31

gang member, he must have been acting with [prohibited] intent . . . ."[7]

Finally, we reject Lopez's contention that he was prejudiced by Officer Castruita's testimony that he knew "Stoney" -- whose son was the subject of a 2018 call between Lopez and Messersmith -- to be a member of the Mexican Mafia. Officer Castruita said nothing about any relationship Lopez might have had with Stoney or the Mexican Mafia. Nor did he say anything about the Mexican Mafia's nature or activities. Unlike in *People v. Albarran* (2007) 149 Cal.App.4th 214, on which Lopez relies, the prosecutor never even mentioned the Mexican Mafia. (Cf. *id.* at 220, 227-228 [police officer's and prosecutor's references to Mexican Mafia contributed to "panoply" of prejudicial gang evidence admitted at defendant's trial, where prosecutor told jury that Mexican Mafia was "violent" gang in control of other gangs, and that defendant had tattoo showing "allegiance" to it].) We conclude it is not reasonably probable that in returning a conviction on count one, the jury seized upon Officer Castruita's passing mention of Stoney's membership in the

---

[7] As Lopez observes, in the course of examining Officer Castruita as a rebuttal witness, the prosecutor mentioned that RSP sounded like a "scary" gang because its primary activities allegedly included murder. While this passing remark might have been intemperate, it was made in the context of asking why Lopez, as a member of a gang that allegedly committed violent crimes, might forego threats of violence in favor of a subtler method of dissuasion -- underscoring the nonviolent nature of the charged offenses.

Mexican Mafia. (Cf. *People v. Penunuri* (2018) 5 Cal.5th 126, 147-149 [where expert testified that gang sign made by members of defendant's gang showed allegiance to Mexican Mafia, but expressly did not claim that defendants were members of Mexican Mafia, trial court acted within its discretion by determining that any potential prejudice from expert's "brief" reference could be cured by admonition].)

Our conclusions above are further supported by facts suggesting the gang evidence generally had little or no impact. The court instructed the jury, "You may not conclude from this evidence [of gang activity] that the defendant is a person of bad character or that he has a disposition to commit crime." Reinforcing this instruction, the prosecutor repeatedly reminded the jurors that their duty was not to judge Lopez's character. Again, we presume the jury followed the court's instructions. (See *People v. Williams*, *supra*, 170 Cal.App.4th at 613.) This presumption is bolstered by the jury's not-true finding on the gang allegation, as well as its failure to return a verdict on the more serious of the two witness-dissuasion counts. (See *id.* at 612-613 [no reasonable likelihood cumulative gang evidence inflamed jury's passions, where jury found gang allegation untrue and convicted defendant only of simple possession rather than possession for sale]; cf. *People v. Garcia* (2008) 168 Cal.App.4th 261, 278 [acquittal of codefendant who belonged to gang and allegedly claimed gang membership at scene of charged shooting indicated that jury "assessed each defendant's guilt and innocence on

an individual basis," and that "gang evidence did not have the prejudicial effect of causing the jury to convict solely because of gang affiliation"].)  The jury convicted Lopez only on count one, concerning which the central facts were undisputed.  The jury's task was simply to interpret, in their context, Lopez's undisputed statements at the courthouse which, as explained, supported its finding that Lopez knowingly and maliciously attempted to dissuade Jose from giving testimony at the preliminary hearing.  Lopez merely speculates that the jury might have interpreted the courthouse encounter differently had the gang evidence been excluded.  Such speculation does not establish a reasonable probability of a more favorable outcome.  For the same reasons, we reject Lopez's contention that the admission of the challenged gang evidence violated his due process rights.  In sum, to the extent the court erred in admitting any of the challenged evidence, any error was harmless.[8]  (See *Partida*, *supra*, 37 Cal.4th at 439.)

---

[8]    The cases on which Lopez relies are distinguishable.  (See *People v. Albarran*, *supra*, 149 Cal.App.4th at 219-222 & fns. 4-5, 227-232 & fn. 16 [defendant's due process rights were violated by admission of "panoply" of gang evidence, where gang evidence bolstered evidence of defendant's identity as perpetrator, prosecutor emphasized gang evidence in arguing it showed criminal disposition, jury convicted defendant of all offenses not charged in alternative, and jury found all associated gang allegations true]; *In re Wing Y.* (1977) 67 Cal.App.3d 69, 78-79 [minor was prejudiced by admission of evidence of gang membership and gang's criminal activities, where prosecution *(Fn. is continued on the next page.)*

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**


MANELLA, P. J.


We concur:


WILLHITE, J.


COLLINS, J.

---

offered gang evidence to prove minor's identity as perpetrator under theory of "'guilt by association,'" and other evidence of identity was "not particularly strong or persuasive"].)